**BRISTOL & MARTIN, Inc. v.
UNITED STATES.**

No. 48523.

United States Court of Claims.
March 3, 1953.

Rehearing Denied Conditionally
April 13, 1953.

See 111 F.Supp. 284.

Victor D. Werner, New York City, for plaintiff.

Thomas O. Fleming, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

JONES, Chief Judge.

Plaintiff sues for excess costs which were incurred in connection with the performance of an experimental contract. The facts in detail are set out in the findings.

The plaintiff initiated the preliminary discussions and later, on December 10, 1942, submitted to the Navy Department a "prospectus," which contained the following:

"We have succeeded in incorporating the following features in our automatic mixture control, some of which are not yet found in present carburetors and fuel injection mixture controls."

A number of features were set forth in the prospectus, the important ones being built around what is known as the speed-density principle.

The stated purpose was to effect revolutionary improvements in the carburetion of airplane engines when flown at high altitudes where the performance of the type of carburetors then in use was adversely affected by the reduced atmospheric density. The correction of this difficulty was of importance to the Navy, especially during the war when a great deal of high-altitude flying was necessary.

Relying upon the representations of plaintiff in which it proposed to manufacture an automatic mixture control device which incorporated certain features not then found in carburetors, and fuel injection controls, the defendant issued a letter of intent, dated January 13, 1943, on the basis of which it undertook to manufacture three fuel metering devices subject to rigorous performance specifications.

The letter signified the intention of the Navy Department to enter into a formal contract for the manufacture of such devices. It was provided that the letter of intent should terminate if a formal contract was not executed by March 30, 1943, unless the time was extended. The letter fixed no price, but stipulated that plaintiff, at the earliest possible date, would submit a firm quotation supported by a cost breakdown.

Due to extensions granted plaintiff, during which time it reported progress, the formal contract was not entered into until September 4, 1943. The pertinent details of the contract are set out in finding 3. The fixed price was $73,787.68, subject to up-

ward or downward revision, pursuant to the terms of the contract. According to approved designs plaintiffs constructed initial models of the devices.

Before the first device was submitted plaintiff wrote the Navy Department that it was running into unforeseen difficulties due to lack of finances, late deliveries by subcontractors and interferences, and asked for an increased price of $10,000 to "partially compensate * * * for our great increase in cost." The Bureau of Aeronautics, Navy Department, agreed to an amendment to the contract, making certain changes, but did not agree to increase the over-all price. This amendment was accepted by plaintiff on June 15, 1944.

Plaintiff, on March 23, 1945, asked for an increase to $176,640.50, the asserted reasons being set out in finding 12.

The Navy Department declined to agree to the increase in price.

Between May 14, 1944, and January 10, 1946, when the contract was terminated for the convenience of the Government, the plaintiff submitted six successive models of the control unit and five of the fuel pump. The basic design and the shape of the models were not changed and the original castings were used throughout the contract period.

None of the units and none of the pumps were satisfactory and none of them met the requirements of the specifications, although plaintiff worked for several months on one of the units completely redesigning it.

Defendant did not order any of the changes nor any redesigning. Plaintiff neither asked for nor received permission from the defendant to make the changes.

Pertinent parts of sections 8 and 4 of the contract are as follows:

"Section 8. *Guarantees.*—(a) The contractor guarantees that the articles provided under this contract will conform to the specifications herein, and will be free from any defects in material and workmanship.

"Section 4. *Inspection.*—(a) * * * In case any articles fail to comply with the requirements of the Section hereof entitled 'Guarantees,' the Government shall have the right to reject such articles, or require their correction or replacement. * * *"

Repeated reworking of models, defective materials, faulty manufacturing procedure and lack of finances contributed to plaintiff's costs.

After the termination of the contract on January 10, 1946, plaintiff requested a retroactive price increase from $73,787.68 to $218,803.36 to cover excess costs over its estimates, and also submitted a termination settlement proposal in the sum of $194,207.47.

The reasons for the adverse decisions on these applications are set out in findings 18 and 19. No appeal was taken from these decisions.

Plaintiff was paid the original contract price of $73,787.68, plus settlement expenses and interest.

Plaintiff incurred costs in excess of the contract revenue in the sum of $106,164.17, a large part of which was attributable to plaintiff's own mistakes, and no part of which was due to any act or fault of defendant in violation of any of the terms and conditions of the contract.

Plaintiff initiated and voluntarily executed an experimental contract, and while it undoubtedly expended more than it had anticipated and a greater amount than it received, we think none of it is chargeable to the Government under the terms of the contract and specifications. Steel Products Engineering Co. v. United States, 78 Ct.Cl. 410; Hervey Veneer Co. v. United States, 74 F.Supp. 940, 110 Ct.Cl. 83.

Plaintiff is not entitled to recover under the terms of the contract.

Defendant has filed a counterclaim. No substantial evidence was offered in its support. It was probably offered as a precautionary step, a sort of safeguard in the event some wayfarer in rambling through the record—the plaintiff having submitted no brief—might find some basis for allowing plaintiff to recover, in which event the defendant would need protection in the way of an offset. Otherwise, according to the

264

statement of the Reconstruction Finance Corporation, out of whose transactions the counterclaim arose, a deficiency judgment would be useless. Perhaps this precaution on the part of defendant's counsel was wise since no mind can tell for certain what another mind may conclude. In the light of the entire record we think plaintiff has been treated fairly.

The petition of the plaintiff and the counterclaim of the defendant are dismissed.

It is so ordered.

HOWELL, MADDEN, WHITAKER, and LITTLETON, Judges, concur.